**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| RUBEN L., | ) NO. CV 19-9052-E |
| Plaintiff, | ) |
| v. | ) **MEMORANDUM OPINION** |
| ANDREW SAUL, Commissioner of Social Security, | ) |
| Defendant. | ) |

**PROCEEDINGS**

Plaintiff filed a complaint on October 21, 2019, seeking review of the Commissioner's denial of benefits. On November 22, 2019, the parties consented to proceed before a United States Magistrate Judge. Plaintiff filed a motion for summary judgment on March 27, 2020. Defendant filed a motion for summary judgment on June 2, 2020. Plaintiff filed an opposition to Defendant's motion for summary judgment on June 17, 2020 ("Plaintiff's Opposition"). The Court has taken the motions under submission without oral argument. See L.R. 7-15; "Order," filed October 24, 2019.

**BACKGROUND**

In March of 2015, when Plaintiff was 16 years old, his mother filed an application for Supplemental Security Income on his behalf (Administrative Record ("A.R.") 19, 509-15, 540).  The application asserts disability since January 31, 2012, based on autism, a learning disorder and "half of [Plaintiff's] brain [being] not fully develop[ed]" (id.).  While this application was pending, Plaintiff turned 18 years of age (A.R. 20, 24).

An Administrative Law Judge ("ALJ") reviewed the record and heard testimony from Plaintiff, Plaintiff's mother, Plaintiff's brother, a medical expert and a vocational expert (A.R. 19-38, 45-168).  The ALJ found that Plaintiff has a severe learning disorder, not otherwise specified (A.R. 24, 32-33).  The ALJ found that Plaintiff did not meet or equal a listed impairment set forth at 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings"), either before or after he turned 18 (A.R. 25-34 (adopting, inter alia, medical expert's opinion at A.R. 59-61 for the period before Plaintiff turned 18)).  The ALJ also found that, after Plaintiff turned 18, he has had the residual functional capacity to perform work at all exertion levels, limited to work involving: (1) simple routine tasks; (2) occasional contact with supervisors; and (3) brief and superficial contact with the public and coworkers.  See A.R. 34-36 (giving moderate weight to the opinion of the psychological consultative examiner).  The ALJ identified certain jobs Plaintiff assertedly could perform.  See A.R. 37 (adopting vocational expert testimony at A.R. 129-30).  Thus, the ALJ denied benefits (A.R. 38).  The Appeals Council denied review (A.R. 1-3).

**STANDARD OF REVIEW**

Under 42 U.S.C. section 405(g), this Court reviews the Administration's decision to determine if: (1) the Administration's findings are supported by substantial evidence; and (2) the Administration used correct legal standards. <u>See</u> <u>Carmickle v. Commissioner</u>, 533 F.3d 1155, 1159 (9th Cir. 2008); <u>Hoopai v. Astrue</u>, 499 F.3d 1071, 1074 (9th Cir. 2007); <u>see also</u> <u>Brewes v. Commissioner</u>, 682 F.3d 1157, 1161 (9th Cir. 2012). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (citation and quotations omitted); <u>see also</u> <u>Widmark v. Barnhart</u>, 454 F.3d 1063, 1066 (9th Cir. 2006).

> If the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ. But the Commissioner's decision cannot be affirmed simply by isolating a specific quantum of supporting evidence. Rather, a court must consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [administrative] conclusion.

<u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098 (9th Cir. 1999) (citations and quotations omitted).

///
///
///
///

**DISCUSSION**

Plaintiff argues that the ALJ erred in: (1) evaluating whether Plaintiff met the criteria for child disability; (2) evaluating Plaintiff's testimony and statements; (3) evaluating the testimony of Plaintiff's mother and brother; (4) failing to include all of Plaintiff's alleged limitations in the ALJ's residual functional capacity assessment; and (5) failing to include all of Plaintiff's alleged limitations in the hypothetical questioning of the vocational expert.  See Plaintiff's Motion, pp. 3-11; Plaintiff's Opposition, pp. 2-10.

After consideration of the record as a whole, Plaintiff's motion is denied and Defendant's motion is granted.  The Administration's findings are supported by substantial evidence and are free from material[1] legal error.  Plaintiff's contrary arguments are unavailing.

I.   **Summary of the Record**

A.   **Plaintiff's Medical Records**

The medical records, which are relatively sparse, reflect diagnoses of, _inter alia_, "anxiety state unspecified" in April of 2010, learning problems at school in August of 2012, lack of normal

---

[1]   The harmless error rule applies to the review of administrative decisions regarding disability.  See Garcia v. Commissioner, 768 F.3d 925, 932-33 (9th Cir. 2014); McLeod v. Astrue, 640 F.3d 881, 886-88 (9th Cir. 2011).

development (unspecified) and development delay (unspecified) in September of 2012, attention deficit without hyperactivity in October of 2012, autistic disorder (active) and autonomic brain abnormality in June of 2015 (A.R. 672, 858).

According to a progress note from June of 2015, Plaintiff's mother stated that Plaintiff had autism with a history of abnormal brain/missing corpus callosum midbrain, and she requested a "neurodevelopment" follow-up (A.R. 878). Examination findings reportedly were normal (A.R. 878-79). Plaintiff was diagnosed with learning problems at school, autonomic brain abnormality and autistic disorder (active) (A.R. 879). Plaintiff was referred to neurology (A.R. 880).

A neurology consultation note from July of 2015 reported that Plaintiff complained of attention deficit and a learning disability (A.R. 875). An electroencephalography report from the following week was abnormal, and the neurologist recommended clinical correlation (A.R. 881). At a follow-up in September of 2015, the neurologist reported that Plaintiff complained of a learning disability/autistic syndrome and attention deficit (A.R. 872). At both neurology examinations, Plaintiff reportedly had a symmetrical face, 5/5 motor strength and 2/4 deep tendon reflexes (A.R. 873, 876). Plaintiff was diagnosed with autistic disorder (active) and anxiety state (unspecified) (A.R. 873-74, 876). No medications were prescribed (A.R. 873).

///
///

A primary care progress note from August of 2017 reported that
Plaintiff presented for a skin condition, but also complained of a
history of agenesia of the corpus callosum,[2] claimed that he became
anxious and "very retracted socially" and asserted he was failing "in
scholar matters" (A.R. 868).  A primary care progress note from
October of 2017 also reported that Plaintiff had corpus callosum
agenesis with mild autism, for which Plaintiff's mother had requested
help (A.R. 861).  Plaintiff had no reported abnormal examination
findings (beyond a skin condition) at either primary care visit, but
Plaintiff nevertheless was diagnosed with autistic disorder (active),
autonomic brain abnormality and "anxiety state unspecified" (A.R. 862,
869).  Again, Plaintiff was referred to neurology (A.R. 870).

Neurological consultations in October and December of 2017
reported intact cranial nerves, 5/5 motor strength, 2/4 deep tendon
reflexes and normal sensation (A.R. 858-59, 865-66).  No other
examination findings were reported (A.R. 858-59, 865-66).  The
neurologist diagnosed development delay (unspecified) and autistic
disorder (active) (A.R. 859).  The neurologist prescribed no
medications and referred Plaintiff for follow-up with psychiatry (A.R.
860).  There are no additional medical records.

---

[2]    Agenesia of the corpus callosum is "a rare birth defect
in which the structure that connects the two hemispheres of the
brain (the corpus callosum) is partially or completely absent."
Kimes v. Colvin, 2016 WL 1253543, at *1 (N.D. Ind. Mar. 31, 2016)
(citation omitted); see also National Institute of Neurological
Disorders and Stroke, Agenesis of the Corpus Callosum Information
Page, at https://www.ninds.nih.gov/Disorders/All-Disorders/
Agenesis-Corpus-Callosum-Information-Page (last visited July 16,
2020) ("[t]he effects of the disorder range from subtle or mild
to severe, depending on associated brain abnormalities").

1          **B.    <u>Plaintiff's School Records</u>**

2

3          Plaintiff received a 2014 Individualized Education Program

4     ("IEP") when Plaintiff was 16 years old and in the 11th grade (A.R.

5     718-45).  Plaintiff reportedly had increased his reading level by 3.1

6     grades within the preceding year and then was reading at a 7.8 grade

7     level (A.R. 720).  He reportedly struggled with reading, writing and

8     math due to a learning disability (A.R. 720-22, 724).  Plaintiff

9     reportedly had excellent school attendance, was always prepared with

10    necessary school supplies, was eager to learn, always put forth his

11    best effort and was friendly and cooperative, but did not participate

12    actively in group work (A.R. 723, 725).  Plaintiff was characterized

13    as an introvert who failed properly to engage with other students

14    (A.R. 741).  However, a December, 2015 annual review reflected that

15    Plaintiff had met all of the goals set by Plaintiff's IEP (A.R. 818-

16    19).

17

18         Plaintiff also received an April, 2016 IEP when Plaintiff was 17

19    years old and in the 12th grade (A.R. 820-44).  He reportedly was able

20    to understand and follow simple multiple-step oral instructions for

21    work-related activities, but needed to develop conversational skills

22    to negotiate and initiate social conversations (A.R. 820).  Within the

23    preceding year, Plaintiff had made "exponential progress" in reading

24    (A.R. 821).  According to the IEP, Plaintiff reportedly knew how to

25    ask for help when he needed it, did his best to complete assignments

26    in class, did the majority of his homework, was able to work well with

27    others and was able to make and keep friends (A.R. 823).  Plaintiff

28    reportedly was going to take the "CAHSEE" (California High School Exit

Exam) with accommodations (A.R. 830).  The record does not reflect the results of any such examination.

Special education teacher Salvador Plascencia[3] completed a teacher questionnaire dated April 30, 2015 (A.R. 757-64).  Mr. Plascencia had known Plaintiff for three years and spent 90 minutes per day teaching Plaintiff English and History (A.R. 757).  Plaintiff reportedly received special education instruction because of an auditory processing learning disability (A.R. 766).  Mr. Plascencia indicated that Plaintiff's reading, math, and written language levels were "far below basic" (A.R. 757).  Mr. Plascencia rated Plaintiff in five domains of functioning used in evaluating child disability (discussed below) (A.R. 758-62).  The ratings utilized a problems scale ascending from "no problems" to "slight problems" to "obvious problems" to "serious problems" to "very serious problems" (id.).  Mr. Plascencia rated Plaintiff as having "obvious" to "serious" problems in acquiring and using information, stating that directions and instructions had to be repeated and rephrased to ensure Plaintiff understood (A.R. 758).  In regard to attending and completing tasks, Plascencia rated "none" to "slight" problems in all areas except carrying out multi-step instructions, where Mr. Plascencia opined that Plaintiff had "obvious" problems (A.R. 759).  Plaintiff reportedly needed prompting to finish assignments and needed to develop organizational skills (A.R. 759).  However, Mr. Plascencia reported no

---

[3]    The name of this teacher appears as "S. Plascencia" on the questionnaire, but the full name, "Salvador Plascencia," appears on certain testing results in the administrative record (A.R. 750, 764, 813).

problems in "interacting and relating with others," "moving about and manipulating objects" or "caring for himself" (A.R. 760-62).

Education specialist Edward Miller completed a teacher questionnaire dated October 22, 2015 (A.R. 771-78).  Mr. Miller had known Plaintiff for two years and spent 90 minutes per school day with Plaintiff teaching History and English (A.R. 771).  Mr. Miller reported that Plaintiff's reading was at a 6th grade level, and his math and written language were at a 5th grade level (A.R. 771).  Mr. Miller rated Plaintiff as having "none" to "slight" problems in acquiring and using information, with the exception of reading and comprehension, expressing ideas in written form, and recalling and applying previously learned material, for which he rated Plaintiff as having "obvious" problems (A.R. 772).  Mr. Miller indicated that Plaintiff was able to follow instructions and answer teacher-generated prompts orally and in writing, but needed extended time and support to succeed academically (A.R. 772).  However, Mr. Miller reported no problems in "attending and completing tasks," "interacting and relating with others," "moving about and manipulating objects" or "caring for himself" (A.R. 773-76).

C.   **Opinion Evidence**

Consultative examiner Dr. Banafshe P. Sharokhi prepared a complete psychological evaluation of Plaintiff dated January 2, 2014, (when Plaintiff was 15 years old) (A.R. 661-67).  Plaintiff reportedly was cooperative and friendly, had fair eye contact and appeared to give genuine effort (A.R. 661).  Dr. Sharokhi did not review any

records before preparing the evaluation (A.R. 663).  Rather,
Plaintiff's mother was the source of the historical information for
the evaluation (A.R. 661-62).  To Dr. Sharokhi, Plaintiff's mother
"appear[ed] to be highly embellishing academic and psychiatric
symptomatology, as reported symptoms appear[ed] highly discrepant with
presentation and current functioning" (A.R. 661-62).  Plaintiff's
mother claimed that Plaintiff had an underdeveloped half side of his
brain (A.R. 663).  She said Plaintiff had a history of speech delays,
communication deficits, and difficulty expressing himself (A.R. 662).
She asserted that Plaintiff did not speak until he was five years old,
and spoke only 2-3 words at 5.5 years old (id.).  She said that the
school district had diagnosed Plaintiff with a learning disability at
age three (A.R. 662).  She also said that, in 2011, Plaintiff was
diagnosed with high functioning autism by a mental health practitioner
(but not by the school district or Plaintiff's doctor, which Dr.
Sharokhi considered "highly suspicious") (id.).

     Plaintiff reportedly was attending 10th grade special education
classes for problems with reading, writing, math and social adjustment
(A.R. 663).  Plaintiff reportedly had friends who were younger than
him and a history of anger spells (A.R. 662-63).  Reportedly,
Plaintiff generally got along well with other children and sometimes
with adults, enjoyed playing with his friends at school and playing
video games with his friends outside of school (A.R. 662-63).
Plaintiff was generally well behaved (A.R. 662).

     On mental status examination, Plaintiff was cooperative,
friendly, had normal mood and affect, normal speech, intact

comprehension, mildly impaired immediate memory, attention and
concentration, coherent thought processes with mild distractibility
evident, and fair insight and judgment (A.R. 664).  Intelligence
testing yielded a valid full scale IQ of 85, within the low average
range, with an indication to rule out a learning disorder (not
otherwise specified), given the significant discrepancies within his
index scores (which ranged from 78 to 100).  See A.R. 665-66; see also
A.R. 668-69 (addendum to Dr. Sharokhi's report re additional reading,
spelling and math testing given which tended to confirm that the 85 IQ
score was accurate); A.R. 749-52, 765 (additional academic testing by
Mr. Plascencia from January of 2015 reflecting below average scores in
math and reading with a recommendation for special education
services).  Dr. Sharokhi opined that Plaintiff did not meet diagnostic
criteria for autistic disorder or any pervasive developmental
disorders (A.R. 667).  Dr. Sharokhi opined that Plaintiff's overall
limitations appeared mild, with the lowest index being a processing
speed of 78 (A.R. 666).  Dr. Sharokhi assessed a Global Assessment of
Functioning ("GAF") score of 60 (A.R. 666).[4]  Dr. Sharokhi opined that
Plaintiff would have mild inability to: (1) understand and respond to
complex requests, instructions or questions; (2) initiate and use
language; (3) interact with peers and adults; and (4) take care of
daily living skills.  See A.R. 667; see also A.R. 669-70 (reaffirming

---

[4]    The GAF scale is used by clinicians to report an
individual's overall level of functioning.  See American
Psychological Association, Diagnostic and Statistical Manual of
Mental Disorders 34 (4th ed. 2000) ("DSM").  A GAF of 51-60
indicates "[m]oderate symptoms (e.g., flat affect and
circumstantial speech, occasional panic attacks) or moderate
difficulty in social, occupational, or school functioning (e.g.,
temporarily falling behind in schoolwork)."  Id.

same after reviewing academic records, including a December, 2012 IEP
and a December, 2013 questionnaire by Mr. Plascencia which are not in
the record).

A state agency psychiatrist reviewed the record in May of 2015,
when Plaintiff was 16 years old, and opined that Plaintiff had less
than marked limitations in all domains of functioning for evaluating
child disability (discussed below), and therefore did not meet the
Listings (A.R. 169-78).  A state agency psychologist reviewed the
record in November of 2015, when Plaintiff was 17 years old, and
agreed with the prior findings that Plaintiff did not meet the
Listings (A.R. 180-89).

Medical expert Dr. Theron Aikens testified on two separate
occasions.  Dr. Aikens testified that there was evidence Plaintiff has
some kind of a learning disorder (A.R. 58-59, 156).  While there was
mention in the record of autism spectrum disorder and corpus callosum
agenesis, Dr. Aikens found no objective support for these diagnoses
(A.R. 156-57).[5]  Dr. Aikens opined that, for the period before
Plaintiff turned 18, Plaintiff had a marked limitation in his ability
to acquire and use information, but less than marked limitations in
///
///
///

_____

[5]     The ALJ gave Plaintiff's counsel time to supplement the
record with any objective evidence regarding these diagnoses
(A.R. 165-68).  It appears that no additional records were
provided.

the remaining areas of functioning (A.R. 60-61).[6]  Dr. Aikens declined
to render an opinion as to Plaintiff's condition as an adult because
Dr. Aikens felt there was insufficient evidence in the record after
Plaintiff turned 18 (A.R. 50-56, 61).  The ALJ then ordered an adult
consultative examination (A.R. 65).

Consultative examiner Dr. Danita Stewart prepared a complete
psychological evaluation of Plaintiff dated December 18, 2017, when
Plaintiff was 19 years old (A.R. 852-57).  Dr. Stewart reviewed Dr.
Sharokhi's evaluation and the December, 2015 IEP (A.R. 853).
Plaintiff's mother claimed that half of Plaintiff's brain was not
fully developed (A.R. 853).  Plaintiff reported a history of learning
difficulties, attending special education since middle school, and
graduating from high school in 2016 (A.R. 853).  Plaintiff also
reported that he socialized with friends on a monthly basis (A.R.
854).

On mental status examination, Plaintiff was pleasant and
cooperative, with borderline intellectual functioning, euthymic mood
and stable affect, moderately diminished memory, mildly diminished
attention and concentration, and a low fund of knowledge (A.R. 854-
55).  Testing yielded a full scale IQ score of 74, but with two

---

[6]     Regarding Plaintiff's ability to interact and relate to
others, Dr. Aikens acknowledged that an IEP reported that
Plaintiff had failed to do group work and was an introvert who
did not engage other students (A.R. 60, 64).  However, Dr. Aikens
also observed that: (1) none of the teachers reported any
problems in that domain; (2) Plaintiff had reported to Dr.
Sharokhi that he had friends in and out of school; and (3) other
records suggested that Plaintiff was well liked by his peers
(A.R. 60, 64 (citing A.R. 663, 669, 686, 741)).

reported subtest scaled scores of zero (an apparent error, see below) (A.R. 855).  Dr. Stewart opined that the test was a valid estimate of Plaintiff's functional level (A.R. 856).  Dr. Stewart assessed a learning disorder (not otherwise specified), borderline intellectual functioning, and a GAF of 60 (A.R. 856).  Dr. Stewart opined that Plaintiff would be able to understand, remember and carry out short, simplistic instructions without difficulty, would have mild inability to understand, remember and carry out detailed instructions based on his borderline intellectual functioning, would be able to make simplistic work-related decisions without special supervision, would be able to interact appropriately with coworkers, supervisors and the public, would have no difficulties maintaining social functioning, would have a mild restriction on daily activities, would have mild difficulties in concentration, persistence or pace, and would have mild inability to maintain attendance and complete an eight-hour workday in a regular workplace setting, but would be able to deal with usual stressors of a competitive workplace setting (A.R. 856-57).[7]

Returning for another hearing after Dr. Stewart's examination, Dr. Aikens opined that Dr. Stewart's evaluation had been incomplete

---

[7]   The record also contains a medical source statement from Dr. Stewart dated December 18, 2017 (A.R. 848-51).  She opined that Plaintiff has none-to-mild impairments in his ability to understand, remember and carry out instructions due to his borderline cognitive functioning (A.R. 848).  Dr. Stewart indicated Plaintiff has no limits in his ability to interact with others or respond to changes in the work setting (A.R. 850).  She stated that Plaintiff has a mild inability to focus and concentrate, particularly on tasks of increasing difficulty, and that he tested low on measures of auditory and visual memory (A.R. 850).

(A.R. 145-61).  Specifically, (as Plaintiff's counsel had suggested (see, e.g., A.R. 645-49)), Dr. Aikens stated that the ALJ should not rely on intelligence testing in Dr. Stewart's evaluation due to the apparently erroneous reporting of zeros for some subtest results (A.R. 158).  Dr. Aikens suggested that the ALJ "toss out" Dr. Stewart's opinions in total (A.R. 158).  However, Plaintiff's counsel refused the ALJ's offer to have Plaintiff undergo another consultative examination in the event the ALJ deemed Dr. Stewart's evaluation inadequate (A.R. 136-37).[8]

### D. **Plaintiff's Statements and Testimony and those of the Lay Witnesses**

Plaintiff testified that he attended special education classes, eight to nine classes at a time, with 10 to 12 other students, a teacher and a teacher's assistant (A.R. 76-78).  Plaintiff claimed that his teachers had to repeat things more than twice for him to get it "stuck into [his] head" (A.R. 78-79).  However, Plaintiff said he had graduated from high school with a regular diploma and did not have to take the California test usually required for such a diploma (A.R. 85-86).[9]

///

---

[8]     Plaintiff does not claim that the ALJ erred by deciding the case without ordering a further consultative examination.

[9]     Plaintiff's counsel stated she did not think that Plaintiff had received a regular diploma, so the ALJ gave counsel the opportunity to submit additional evidence regarding the issue (A.R. 86-87).  It does not appear that counsel submitted any additional evidence contrary to Plaintiff's testimony that he graduated from high school with a regular diploma.

Plaintiff said he had not looked for work since he graduated because he gets nervous and scared around people he does not know (A.R. 84-85). Plaintiff said he had refused to learn how to use the bus by himself and he did not like going out alone (A.R. 79). Plaintiff said that, when he was in school, he did not really have friends with whom he hung out (A.R. 85). However, he admitted he did have one friend with whom he goes to the mall, movies, and other places by taxi or with rides from that friend's mother (A.R. 79-80). Plaintiff said his mother was teaching him to cook, and he was able to do dishes, vacuum, do laundry with his mother, take care of two cats, play video games and watch television (A.R. 80-84, 88).

Plaintiff testified that, through a school program, he had worked part time (_i.e._, 50 hours a month for two months) as a stock clerk for Walgreen's during his senior year of high school (A.R. 89-90). Plaintiff walked to and from this job by himself (A.R. 94). Plaintiff said he had trouble in the first couple of weeks with people asking him where things were in the store because he had not learned about the store's products (A.R. 90). Plaintiff also had made one mistake by failing to check for expiration dates (A.R. 93-94). He said he was able to accept feedback from his boss (A.R. 93-94). Plaintiff said he could stock shelves after three weeks of learning, but he had not wanted to continue working after the school program ended because he did not like dealing with people (A.R. 91-93). Plaintiff said he thought he could do simple work if he did not have to deal with people and if the job were near him (A.R. 91-92).

///

///

1     Plaintiff's mother testified that Plaintiff could not cook
2   without her there because he supposedly is afraid (A.R. 97).  She said
3   she has to remind Plaintiff many times to do his household chores
4   (A.R. 97-98).  She said that Plaintiff rarely communicates and he gets
5   nervous, timid and fearful when he meets people whom he does not know
6   (A.R. 99-100, 125).  She claimed Plaintiff never goes out alone and
7   always has "a whole lot of excuses" for not doing things (A.R. 125-
8   27).[10]

9

10    Plaintiff's brother testified that Plaintiff feels weird around
11  other people and does not feel safe being out "on the street" by
12  himself (A.R. 67-68).  He said that Plaintiff was able to walk alone
13  to school after the brother spent two or three weeks showing him the
14  way (A.R. 72; but see A.R. 95-96 (Plaintiff testifying that his
15  brother did not walk with him to school)).  The brother also said
16  Plaintiff walked home from school with friends who lived on the same

17  _____

18        [10]    In a Disability Report - Child form in English
    completed by Plaintiff's mother dated March 2, 2015, Plaintiff's
19  mother reported that she could not speak and understand or read
    and understand English; her preferred language was Spanish (A.R.
20  538-49).  In a Function Report - Child form stamped March 12,
    2015, which was also in English, Plaintiff's mother reported,
21  inter alia, that Plaintiff: (1) was attending school full time;
    (2) could not repeat stories he had heard; (3) could not explain
22  why he did something; (4) is very shy, "has little people
    skills," only makes friends when he wants to make friends;
23  (5) reads and understands at an eighth grade level; (6) cannot
    make new friends or generally get along with her, adults, or his
24  siblings; (7) cannot help around the house, cook meals for
    himself, take needed medication, use public transportation by
25  himself, accept criticism or correction or obey rules at home,
    and he rarely asks for help; and (8) cannot keep busy on his own,
26  finish things he starts or complete chores most of the time, and
    he must be told more than once and reminded of what he needs to
27  do to stick with a task (A.R. 550-58).
28

street (A.R. 73).  Plaintiff's brother had met only one of Plaintiff's friends with whom Plaintiff spent time (A.R. 68-69).  That friend's mother would drive Plaintiff and the friend to the mall or to the movies approximately once a month (A.R. 68, 73).  He said that Plaintiff needed reminding, but was able to do household chores (A.R. 69-70).  Plaintiff was able to watch television and play simple video games that do not involve critical thinking (A.R. 71-72, 74-75).  He said that Plaintiff had not tried to work since he turned 18 because Plaintiff was afraid that other people would see him as "different" (A.R. 75).

## II.   **Substantial Evidence Supports the Conclusion that Plaintiff is Not Disabled.**

Substantial evidence supports the conclusion Plaintiff was not disabled during either of the relevant time periods.

### A.   **Plaintiff Did Not Meet His Burden of Establishing Disability Before He Turned 18.**

For the period before he turned 18 years old, Plaintiff had the burden to prove that his impairment(s) then met or medically equaled a listed impairment.  <u>See</u> 20 C.F.R. § 416.924 (outlining disability determination procedure); <u>see also</u> 20 C.F.R. § 416.912(a) (child claimant bears the burden of establishing how his impairments affects his functioning).  Plaintiff did not meet this burden.

///

///

In determining whether a child's impairment or combination of impairments functionally equals an impairment in the Listings, the Commissioner must assess the child's functioning in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. See 20 C.F.R. 416.926a(a)-(b). To functionally equal the Listings, the impairment(s) must result in a "marked" limitation in two domains or an "extreme" limitation in one domain (20 C.F.R. 416.926a(d)). A "marked" limitation is one that "interferes seriously" with the ability independently to initiate, sustain, or complete activities (20 C.F.R. 416.926a(e)(2)). An "extreme" limitation is one that "interferes very seriously" with the ability independently to initiate, sustain, or complete activities (20 C.F.R. 416.926a(e)(3)).


Here, the ALJ found that Plaintiff had marked limitations in acquiring and using information, but less than marked limitations in the remaining domains (A.R. 27-32 (giving great weight to Dr. Aikens' opinion finding the same, great weight to Dr. Sharokhi's opinion that Plaintiff at most had mild limitations, and moderate weight to the state agency physicians' opinions that Plaintiff would have less than marked limitations in all domains)). The referenced medical opinions constitute substantial evidence supporting the ALJ's non-disability determination. See Orn v. Astrue, 495 F.3d 625, 631-32 (9th Cir. 2007) (opinion of examining physician based on independent clinical findings can provide substantial evidence to support administrative conclusion of non-disability); Tonapetyan v. Halter, 242 F.3d 1144,

1149 (9th Cir. 2001) (opinion of non-examining physician "may
constitute substantial evidence when it is consistent with other
independent evidence in the record"); Andrews v. Shalala, 53 F.3d
1035, 1041 (9th Cir. 1995) (where the opinions of non-examining
physicians do not contradict "all other evidence in the record" an ALJ
properly may rely on these opinions) (citation and emphasis omitted).

Significantly, no medical source (or non-medical source outside
of Plaintiff's family) opined that Plaintiff had materially greater
limitations.  The record contains no treating doctor's opinion
concerning Plaintiff's functional limitations.  Plaintiff's special
education teachers did not report marked limitations in any two
domains of functioning (A.R. 757-64, 771-78).

Plaintiff argues that the ALJ erred in finding that Plaintiff did
not have marked limitations in the domains of attending and completing
tasks (Domain 2) and interacting and relating with others (Domain 3)
(Plaintiff's Motion, p. 3).  Plaintiff argues that the ALJ should have
discerned marked limitations in these domains based on: (1) Mr.
Plascencia's opinion that Plaintiff needed prompting to finish
assignments and Mr. Miller's assertedly similar opinion (Domain 2)
(A.R. 759, 772); (2) the claims of Plaintiff's mother that Plaintiff
required repeated prompting to remind him of tasks and that Plaintiff
did not complete tasks (Domain 2) (A.R. 557); (3) Plaintiff's
testimony that he required repeated prompts from his teachers for him
to complete a task (Domain 2) (A.R. 78-79); (4) Plaintiff's IEP
indicating that he was unable actively to participate in group work,
was an introvert who failed properly to engage other students and

needed to develop conversational skills to negotiate and initiate social conversations (Domain 3) (A.R. 686, 707, 820); (5) the testimony of Plaintiff and his brother that Plaintiff had only one friend whom Plaintiff saw once a month (Domain 3) (A.R. 68-69, 73, 79-80); and (6) the claims of Plaintiff's mother that Plaintiff did not get along with adults or siblings, did not make new friends, rarely communicates with others, gets nervous and does not trust others (Domain 3) (A.R. 125, 555). See Plaintiff's Motion, pp. 3-5; Plaintiff's Opposition, pp. 2-4.

An ALJ is not required to discuss all evidence found unpersuasive; an ALJ is only required to explain why significant probative evidence has been rejected. See Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003); Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984). Here, the ALJ expressly acknowledged the conflicting evidence on which Plaintiff relies (A.R. 26, 29-30, 33-34). However, the ALJ also expressly found more persuasive other aspects of Plaintiff's testimony, other aspects of the IEP reports, and other statements made by Plaintiff and his mother to Dr. Sharokhi (A.R. 26, 29-30 (citing A.R. 85, 89-93, 667, 686, 823)). Such evidence reflected that Plaintiff had proper school attendance for a full schedule of classes, did his best to complete assignments in class, did the majority of his homework, graduated with a regular diploma, was able to work independently stocking shelves for two months (even though he had some difficulty interacting with customers), got along with adults and siblings, made and kept friends and was able to work well with others (id.).

///

It was the ALJ's prerogative to weigh the evidence and to find, (in accordance with the opinions of Plaintiff's teachers, the state agency psychiatrist and Dr. Aikens) that Plaintiff did not have marked limitations in Domains 2 and 3. As detailed above, Mr. Plascencia opined that Plaintiff did not have any "serious" problems in attending and completing tasks and had no problems interacting and relating with others, and Mr. Miller found no problems in either of these two domains (A.R. 759-60, 773-74). The state agency psychiatrist found that Plaintiff did not have marked impairments in any domains (A.R. 173-74). Dr. Aikens considered Plaintiff's IEPs and the teachers' reports referencing the alleged limitations Plaintiff urges, but Dr. Aikens nevertheless concluded that Plaintiff had less than marked limitations in Domains 2 and 3 (A.R. 59-64).

While Plaintiff argues contrary interpretations of the evidence in the record and relies heavily on the claims of his mother and brother, it was for the ALJ to interpret the evidence, evaluate credibility and resolve any conflicts in the evidence. See Treichler v. Commissioner, 775 F.3d 1090, 1098 (9th Cir. 2014) (court "leaves it to the ALJ" "to resolve conflicts and ambiguities in the record"); accord Lewis v. Apfel, 236 F.3d 503, 509 (9th Cir. 2001); Andrews v. Shalala, 53 F.3d at 1039-40. When evidence "is susceptible to more than one rational interpretation," the Court must uphold the administrative decision. See Andrews v. Shalala, 53 F.3d at 1039-40; accord Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002); Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997). The Court will uphold the ALJ's rational interpretation of the evidence in the present case notwithstanding any conflicts in the evidence.

**B.** **Substantial Evidence Supports the Conclusion that Plaintiff Was Capable of Work After He Turned 18.**

Substantial evidence also supports the ALJ's non-disability determination for the time period after Plaintiff turned 18.  No treating doctor opined that Plaintiff has greater limitations than the limitations the ALJ found to exist.  The ALJ relied on Dr. Stewart's opinions (minus the unreliable IQ scores) in determining Plaintiff's residual functional capacity, supported by Dr. Aikens' earlier opinions, Dr. Sharokhi's opinions, the IEPs, the teacher questionnaires, and much of the testimony of Plaintiff and his family (A.R. 35-36).  Dr. Stewart's opinions provide substantial evidence for the ALJ's decision.  See Orn v. Astrue, 495 F.3d at 631-32.

The vocational expert testified that a person with the residual functional capacity the ALJ found to exist could perform certain jobs existing in significant numbers in the national economy (A.R. 129-30). The ALJ properly relied on this testimony in denying disability benefits for the period after Plaintiff turned 18.  See Barker v. Secretary of Health and Human Services, 882 F.2d 1474, 1478-80 (9th Cir. 1989); Martinez v. Heckler, 807 F.2d 771, 774-75 (9th Cir. 1986).

///

///

///

///

///

///

///

1  **III.  <u>Plaintiff's Remaining Arguments are Unavailing.</u>**[11]

2

3        Plaintiff argues that the ALJ erred in: (a) evaluating evidence

4  from Plaintiff; (b) evaluating evidence from the other lay witnesses;

5  (c) failing to include all of Plaintiff's alleged limitations in the

6  ALJ's residual functional capacity assessment; and (d) failing to

7  include all of Plaintiff's limitations in the hypothetical questioning

8  of the vocational expert.  <u>See</u> Plaintiff's Motion, pp. 3-11;

9  Plaintiff's Opposition, pp. 2-10.  As discussed below, these arguments

10  are rejected.

11

12       An ALJ's assessment of a claimant's credibility is entitled to

13  "great weight."  <u>Anderson v. Sullivan</u>, 914 F.2d 1121, 1124 (9th Cir.

14  1990); <u>Nyman v. Heckler</u>, 779 F.2d 528, 531 (9th Cir. 1985).  Where, as

15  here, an ALJ finds that the claimant's medically determinable

16  impairments reasonably could be expected to cause some degree of the

17  alleged symptoms of which the claimant subjectively complains, any

18  discounting of the claimant's complaints must be supported by

19  specific, cogent findings.  <u>See</u> <u>Berry v. Astrue</u>, 622 F.3d 1228, 1234

20  (9th Cir. 2010); <u>Lester v. Chater</u>, 81 F.3d 821, 834 (9th Cir. 1995);

21  <u>but see</u> <u>Smolen v. Chater</u>, 80 F.3d 1273, 1282-84 (9th Cir. 1996)

22  (indicating that ALJ must offer "specific, clear and convincing"

23  ─────────────────────

24       [11]    The Court has considered and rejected all of the
arguments raised in Plaintiff's motion for summary judgment and

25  in Plaintiff's Opposition.  The Court discusses Plaintiff's
principal arguments herein.  Neither Plaintiff's arguments nor

26  the circumstances of this case show any "substantial likelihood
of prejudice" resulting from any error allegedly committed by the

27  ALJ.  <u>See generally</u> <u>McLeod v. Astrue</u>, 640 F.3d 881, 887-88 (9th
Cir. 2011) (discussing the standards applicable to evaluating

28  prejudice).

reasons to reject a claimant's testimony where there is no evidence of "malingering").[12]  An ALJ's credibility finding "must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony." Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004) (internal citations and quotations omitted); see also Social Security Ruling ("SSR") 96-7p (explaining how to assess a claimant's credibility), superseded, SSR 16-3p (eff. Mar. 28, 2016).[13]

An ALJ may discount lay witness testimony where the testimony is similar to the claimant's testimony and the ALJ has given legally sufficient reasons for discounting the claimant's testimony.  See Valentine v. Commissioner Social Sec. Admin., 574 F.3d 685, 694 (9th Cir.2009) ("In light of our conclusion that the ALJ provided clear and convincing reasons for rejecting Valentine's own subjective

---

[12]   In the absence of an ALJ's reliance on evidence of "malingering," most recent Ninth Circuit cases have applied the "clear and convincing" standard.  See, e.g., Leon v. Berryhill, 880 F.3d 1041, 1046 (9th Cir. 2017); Brown-Hunter v. Colvin, 806 F.3d 487, 488-89 (9th Cir. 2015); Burrell v. Colvin, 775 F.3d 1133, 1136-37 (9th Cir. 2014); Treichler v. Commissioner, 775 F.3d at 1102; Ghanim v. Colvin, 763 F.3d 1154, 1163 n.9 (9th Cir. 2014); Garrison v. Colvin, 759 F.3d 995, 1014-15 & n.18 (9th Cir. 2014); see also Ballard v. Apfel, 2000 WL 1899797, at *2 n.1 (C.D. Cal. Dec. 19, 2000) (collecting earlier cases).  In the present case, the ALJ's findings are sufficient under either standard, so the distinction between the two standards (if any) is academic.

[13]   The appropriate analysis under the superseding SSR is substantially the same as the analysis under the superseded SSR. See R.P. v. Colvin, 2016 WL 7042259, at *9 n.7 (E.D. Cal. Dec. 5, 2016) (stating that SSR 16-3p "implemented a change in diction rather than substance") (citations omitted); see also Trevizo v. Berryhill, 871 F.3d 664, 678 n.5 (9th Cir. 2017) (suggesting that SSR 16-3p "makes clear what our precedent already required").

complaints, and because Ms. Valentine's testimony was similar to such complaints, it follows that the ALJ gave germane reasons for rejecting her testimony."); see generally Smolen v. Chater, 80 F.3d at 1288 ("[T]he ALJ can reject the testimony of lay witnesses only if he gives reasons germane to each witness whose testimony he rejects."). Here, the ALJ stated sufficient reasons for deeming Plaintiff's subjective complaints and the lay witnesses' statements less than fully credible.

In finding Plaintiff capable of performing work limited to simple routine tasks with occasional contact with supervisors and brief and superficial contact with the public and coworkers, the ALJ considered Plaintiff's statements concerning his limitations (A.R. 35). As summarized above, Plaintiff had testified, inter alia, that he attended special education classes with 10 to 12 other students, needed teachers to repeat things more than twice for him to get it "stuck into [his] head"[14] and gets nervous and scared around people he does not know (A.R. 76-79, 84-85).

To the extent these statements may have suggested greater limitations than the ALJ found to exist, the ALJ found these statements not entirely consistent with other evidence in the record, including other evidence from Plaintiff himself (A.R. 26, 33-35). Specifically, the ALJ found Plaintiff was capable of greater learning than he or his mother and brother sometimes reported, as evidenced by:

---

[14]    The vocational expert testified that, if a person with the limitations the ALJ found to exist were further limited by the need to be reminded two to three times a day to complete tasks, or were off task 15 percent or more of the workday, such limitations would preclude employment (A.R. 130).

(1) an IEP reflecting that Plaintiff was able to increase his reading abilities by more than three grades in one school year (A.R. 720); (2) the testimony of Plaintiff's brother that Plaintiff plays simple video games without needing instruction (A.R. 74-75); (3) Plaintiff's testimony that he took a full schedule of 8-9 high school classes and graduated with a regular diploma (A.R. 77-78, 85-86);[15] and (4) Plaintiff's testimony that he was able to work as a stock clerk for Walgreen's for 100 hours over a two month period, where he learned to work independently stocking shelves and was able to take instruction and learn from his errors (A.R. 89-94).  See A.R. 26, 33-35.  The ALJ also noted that Plaintiff had testified that he was able to walk to and from school by himself and was able to walk to and from Walgreen's by himself (A.R. 94-96), that he was learning how to cook from his mother and could cook a couple of dishes (A.R. 80-81), and that he could go to the mall and to movies with a friend (A.R. 79-80).  See A.R. 35.  The ALJ was not required to accept other, inconsistent reports of Plaintiff's abilities.  See Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (claimant's inconsistencies can adversely impact claimant's credibility); Verduzco v. Apfel, 188 F.3d 1087, 1090 (9th Cir. 1999) (inconsistences in a claimant's statements were among the "clear and convincing reasons" for discounting claimant's

---

[15]    Plaintiff's counsel takes issue with the ALJ's reliance on Plaintiff's diploma.  Counsel argues that Plaintiff did not pass the California proficiency exam.  See Plaintiff's Motion, pp. 6-7 (citing A.R. 685, 797 concerning testing information before Plaintiff's senior year).  The evidence in the record did not require the ALJ to dismiss the significance of the diploma. Although there was discussion of accommodations for testing (A.R. 797), there is no report in the record of any senior year test results.  Further, Plaintiff testified that he earned a regular diploma and did not have to take the test (A.R. 85-86).

credibility).

    The ALJ acknowledged claims by Plaintiff's mother and brother that Plaintiff could not make new friends, generally did not get along with adults or siblings, could not keep busy on his own, did not finish things he started, required constant reminding to do chores, did not complete chores, has difficulty with video games requiring critical thinking, will not go places by himself, and has difficulty interacting with people he does not know (A.R. 26, 33-35). However, the ALJ also cited evidence to the contrary, e.g.: (1) Plaintiff's mother had reported to Dr. Sharokhi that Plaintiff generally got along with other children (A.R. 662); (2) Plaintiff's teachers did not report that Plaintiff had any problems in "interacting and relating with others" (A.R. 761, 774); (3) Plaintiff's IEP review reported that Plaintiff was able to work well with others, could make and keep friends, did his best to complete assignments and did the majority of his homework (A.R. 823); (4) Plaintiff had testified that he could wash dishes, vacuum, take out trash, clean his room, care for two cats, and work for Walgreen's without someone constantly watching over him and telling him what to do (A.R. 80-84, 88, 93) (suggesting to the ALJ that any issue with completing household chores was actually a "motivational problem"); and (5) Dr. Sharokhi had reported that Plaintiff's mother appeared to be highly embellishing Plaintiff's symptomatology, which included great discrepancies from Plaintiff's presentation and functioning (A.R. 661-62). See A.R. 30, 34-35. The ALJ's discussion of such evidence more than satisfied the requirement of stating reasons germane for the rejection of the lay witness testimony at issue. See Lewis v. Apfel, 236 F.3d 503 (9th Cir. 2001)

(conflicts with the medical evidence or with evidence from the claimant can constitute "germane reasons" to reject the testimony of a lay witness).

In the present case, the ALJ stated sufficient valid reasons to allow this Court to conclude that the ALJ discounted on permissible grounds the portions of the statements of Plaintiff and the portions of the statements of the lay witnesses on which Plaintiff now relies. See Moisa v. Barnhart, 367 F.3d at 885. The Court therefore defers to the ALJ's credibility determinations. See Lasich v. Astrue, 252 Fed. App'x 823, 825 (9th Cir. 2007) (court will defer to Administration's credibility determination when the proper process is used and proper reasons for the decision are provided); accord Flaten v. Secretary of Health & Human Services, 44 F.3d 1453, 1464 (9th Cir. 1995).[16]

The Court also rejects Plaintiff's arguments that the ALJ should have included in the ALJ's residual functional capacity assessment, and in the hypothetical questioning of the vocational expert, various alleged limitations the ALJ did not find to exist. As discussed above, substantial evidence supports the ALJ's residual functional capacity assessment, and the ALJ properly discounted the testimony and statements suggesting greater limitations. Hypothetical questions posed to a vocational expert need not include all conceivable limitations that a favorable interpretation of the record might

---

[16] The Court should not and does not determine the credibility of the witnesses' testimony. Absent legal error, it is for the Administration, and not this Court, to do so. See Magallanes v. Bowen, 881 F.2d 747, 750, 755-56 (9th Cir. 1989).

suggest to exist – only those limitations the ALJ finds to exist. See, e.g., <u>Bayliss v. Barnhart</u>, 427 F.3d 1211, 1217-18 (9th Cir. 2005); <u>Rollins v. Massanari</u>, 261 F.3d 853, 857 (9th Cir. 2001); <u>Magallanes v. Bowen</u>, 881 F.2d at 756-57.  Here, the hypothetical questioning of the vocational expert included all of the limitations the ALJ properly found to exist.

**CONCLUSION**

For all of the foregoing reasons, Plaintiff's motion for summary judgment is denied and Defendant's motion for summary judgment is granted.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED: July 22, 2020.

_____
/s/
CHARLES F. EICK
UNITED STATES MAGISTRATE JUDGE